**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X          **05 CV 5575 (NG)**
**RICHARD PEREZ,**

                               **Petitioner,**

        **-against-**                                                              **OPINION**

**SUPERINTENDENT DAVID MILLER,**


                               **Respondent.**
------------------------------------------------------------------X

**GERSHON, United States District Judge:**

        Richard Perez applies to this court under 28 U.S.C. § 2254 for a writ of habeas corpus,

alleging that he is being held in custody in violation of the Constitution and laws of the United

States pursuant to the judgment of a court of the State of New York.  For the reasons set forth

below, petitioner's application is denied.

*Trial*

        Petitioner was tried before Justice Sheri S. Roman, Supreme Court, Queens County.

During jury selection the prosecution peremptorily struck venire person Berky Lugo. The

defense made a motion pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986), arguing that Mrs.

Lugo, an Hispanic woman, was struck for discriminatory reasons. After discussion, the court

upheld the strike of Mrs. Lugo, finding that it was not motivated by discrimination.

        At trial, the State introduced the testimony of Detective Joseph Bello, a crime scene

investigator; Detective Kevin Barry, a ballistics expert; Police Officer Rodney Rennald, the first

officer to arrive at the crime scene; Dr. Joseph Veress, the medical examiner; Jerry Connell, an

employee of Bell Atlantic who was a phone record custodian; Jennifer Vasquez, petitioner's former girlfriend; and Victor Ferra. Petitioner offered no evidence on his own behalf.

Taking the evidence in the light most favorable to the prosecution, the State established the following: the police found Franklin Lopez's body on December 13, 1995, in the back of a car parked in the vicinity of 85th Road and Woodhaven Boulevard in Queens. An examination by the medical examiner revealed that Mr. Lopez had been shot six times in the torso. There were post-mortem abrasions on Mr. Lopez's body that were consistent with being dragged after he was shot. A wallet was also recovered from Mr. Lopez's pants containing a slip of paper on which was written a pager number. The name "Pellin," which is the name of the uncle of petitioner's girlfriend at the time, was written next to the pager number. Bullet fragments recovered from the body indicated that the murder weapon was a .32 caliber gun.

Nearly seven months later, on June 27, 1996, while riding in a stolen car, petitioner and Victor Ferra were arrested for Criminal Possession of Stolen Property. Realizing that there were outstanding warrants for his arrest, Ferra gave the police a false name. When the police discovered his true identity, Ferra, in an effort to receive lenient treatment, claimed to have information regarding Lopez's homicide. Ferra claimed that during a conversation with petitioner five months earlier, petitioner told him that he had murdered Lopez because of a debt from a drug deal. Ferra entered into a cooperation agreement with the District Attorney's Office. The terms of that agreement required that he testify against petitioner and not be re-arrested. Ferra violated that agreement when he was later arrested for Robbery in the Second Degree and Criminal Impersonation. Ferra then entered into a new cooperation agreement whereby, in

exchange for his testimony, he would plead guilty to criminal impersonation and receive a sentence of one and one half to three years' incarceration.

At trial Ferra testified that he met petitioner in 1990 at a friend's sandwich shop. When the shop closed in 1992, he lost contact with petitioner and did not see him for four years. In January 1996, while selling bootleg videotapes in Brooklyn, Ferra saw petitioner. Ferra asked petitioner for a ride to Queens and petitioner agreed. Ferra claims that, while in the car, petitioner told him that he had killed a man. Petitioner had owed the victim twelve to fifteen thousand dollars for heroin he had received for resale. The victim had been harassing petitioner for money and paging him all the time.

According to Ferra's testimony, petitioner claimed to have invited the man to his house, and, once in the basement, shot him with a .32 caliber gun. When petitioner ran out of bullets, he went up to his bedroom, reloaded the gun, and shot the victim two more times in the head. Because the man was quite heavy, he asked his brother to help him move the body. He and his brother dragged the body out of the house and put it into the victim's car. At trial Ferra testified that petitioner told him that he had driven alone to 85th Road and parked the car leaving the body inside; in the grand jury Ferra had testified that petitioner told him that both he and his brother rode in the car to Woodhaven. Ferra testified that, on two occasions, while riding in petitioner's car, petitioner pointed out the location where he had parked the car after the homicide.

Ferra also testified to having met petitioner's then-girlfriend, Jennifer Vasquez, as well as her parents, brother, and her uncle "Pellin." Ferra testified that, when he called Vasquez's pager, 917-872-8438, he would receive a return call from petitioner. That number was the same number that was found by the police on a piece of paper in Lopez's wallet when they recovered

his body.  Lopez's telephone records indicated that he called that pager number seven times between November 13, 1995 and December 11,1995.  There were no calls made to that pager number after the call on December 11, 1995.

At the conclusion of its case, the State sought to admit into evidence a Certificate of Conviction for Franklin Lopez, indicating that he had been convicted of a drug crime in 1976, and served a sentence of sixteen years for that conviction.  Petitioner opposed the introduction of the evidence on the grounds that it was inadmissible character evidence of the deceased and also because the conviction was too remote in time to be relevant to the question of Mr. Lopez's drug activity at the time of his death.  The court ruled that, without adducing evidence of the 16-year sentence Mr. Lopez served, and with a limiting instruction, the State would be permitted to introduce the fact that he had previously been convicted of a drug crime.  The evidence was so admitted.

During summations, defense counsel objected to various comments by the prosecution and twice moved for a mistrial.  The judge sustained many of petitioner's objections and gave curative instructions, but denied defense counsel's motion for a mistrial.

At the trial's conclusion, petitioner was convicted of one count of Murder in the Second Degree and Criminal Possession of a Weapon in the Second Degree. On October 12, 1999, petitioner was sentenced to concurrent prison terms of twenty years to life for Murder in the Second Degree and ten years for Criminal Possession of a Weapon in the Second Degree.

*Post-Trial Proceedings*

In August 2002, petitioner appealed to the Appellate Division, Second Department. Petitioner's counsel argued that:

> [T]he trial court denied [petitioner] a fair trial by allowing the [P]eople to introduce evidence that, nineteen years before he was killed, the deceased was convicted of first degree drug sale, because the conviction was too remote and therefore not relevant as corroboration for the key prosecution witness' claim that [petitioner] had told him that he had shot a drug dealer. (U.S. CONST. amends. V, XIV; N.Y. CONST. art. 1, § 6)

Brief for Def.-App. at 12.

With the court's permission, petitioner also filed a pro se supplemental brief. He argued that he was convicted because of nullification, that the evidence was legally insufficient to establish his guilt beyond a reasonable doubt, that there was an improper variance between the evidence adduced at trial and the allegations set forth in the indictment against him, and that the State purposefully deceived the trial court into upholding a peremptory challenge motivated by racial discrimination.

On October 6, 2003, the Appellate Division, Second Department, affirmed petitioner's judgment of conviction. *People v. Perez*, 309 A.D.2d 769 (2d Dept. 2003). The Appellate Division held that petitioner's insufficiency of evidence claim was unpreserved, and, in any event, without merit. *Id.* The remaining claims were either "unpreserved for appellate review, without merit, or d[id] not require reversal." *Id.* On January 13, 2004, the Court of Appeals denied petitioner's application for leave to appeal. *People v. Perez*, 1 N.Y.3d 600 (2004).

On April 8, 2005 petitioner filed an application in the Appellate Division, Second Department, for a writ of error coram nobis, claiming that he was denied effective assistance of appellate counsel. Specifically, petitioner argued that appellate counsel should have argued that the trial court erred when it denied petitioner's motion for a mistrial based upon prosecutorial misconduct. On August 22, 2005, the Appellate Division denied the application, and on

November 28, 2005 the Court of Appeals denied leave to appeal. *People v. Perez*, 21 A.D.3d 569 (2d Dept. 2005), *lv. denied*, 5 N.Y. 3d 884 (2005).

*Discussion*

Petitioner raises three issues in this petition. First, petitioner argues that he was denied the Equal Protection of the Law when the prosecutor struck an Hispanic juror for discriminatory reasons and the trial court denied his *Batson* claim. Second, petitioner argues that he was denied the effective assistance of appellate counsel because counsel failed to raise the issue of prosecutorial misconduct. Third, petitioner argues that the admission of Lopez's prior drug conviction denied petitioner a fundamentally fair trial.

## I. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214 (1996), established a deferential standard that federal courts must apply in reviewing state court decisions on habeas review. Under AEDPA, a federal court may grant habeas relief with respect to a federal claim adjudicated on the merits[1] in state court only if the adjudication of the claim resulted in a decision that was either: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). In addition, "a determination of a factual issue made by a State court shall be presumed to be correct," and the

---

[1] The Second Circuit has made clear that "when a state court rejects a petitioner's claim as either unpreserved or without merit, the conclusive presumption is that the adjudication rested on the merits." *Hawkins v. Costello,* 460 F.3d 238, 242 (2d Cir.2006) (citing *Jiminez v. Walker,* 458 F.3d 130, 146 (2d Cir.2006)). Here, because the Appellate Division rejected petitioner's claims on direct appeal as "either unpreserved for appellate review, without merit, or . . . not requir[ing] reversal," *Perez*, 309 A.D.2d at 769, and rejected the the coram nobis appeal as "fail[ing] to establish the ineffective assistance of appellate counsel," *Perez*, 21 A.D.3d at 569, this court owes that adjudication AEDPA deference. *Hawkins,* 460 F.3d at 242.

applicant for habeas relief has the burden of "rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). This presumption of correctness does not apply where the state court did not make a factual determination or the determination is "not fairly supported by the record." *Galarza v. Keane*, 252 F.3d 630, 635 (2d Cir. 2001).

A state court's decision is "contrary to" clearly established Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor,* 529 U.S. 362, 413 (2000). A state court decision is an "unreasonable application" of federal law "if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* "In other words, a federal court may grant relief when a state court has misapplied a governing legal principle to a set of facts different from those of the case in which the principle was announced." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (internal quotation marks omitted). The Supreme Court has emphasized that the reasonableness of the application of the law is to be assessed objectively rather than subjectively. *Williams*, 529 U.S. at 409-10. Therefore, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. Interpreting *Williams*, the Second Circuit has explained that, although "[s]ome increment of incorrectness is required . . . the increment need not be great." *Francs S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000).

## II. The Batson Claim

Petitioner argues that, under *Howard v. Senkowski*, 986 F.2d 24 (2d Cir. 1993), because the prosecution acted with mixed motives in striking an Hispanic juror, it became the prosecution's ultimate burden to prove that the strike would have been exercised in any event for legitimate reasons. 986 F.2d 24, 30 (2d Cir. 1993). In the alternative, petitioner requests this Court set aside the statutory presumption of correctness afforded the trial court's finding that the prosecution's explanation for the strike was not pretextual because, petitioner argues, that finding was without evidentiary support.

Respondent argues that the Court should not apply *Howard* because it is not a Supreme Court case and therefore not applicable; it was decided before Congress enacted the AEDPA; and it is inapposite to the facts of this case. Respondent also argues that petitioner cannot overcome the presumption of correctness afforded the trial court's factual findings.

*Batson v. Kentucky*, 476 U.S. 79 (1986), established a defendant's right to challenge, on equal protection grounds, a prosecutor's use of a peremptory challenge to exclude jurors on the basis of race. *Batson* also established a three-step procedure courts must utilize when determining the validity of an equal protection challenge. *Id.* at 96-98. The Second Circuit summarized this procedure as follows:

> First, a trial court must decide whether the party challenging the strike has made a *prima facie* showing that the circumstances give rise to an inference that a member of the venire was struck because of his or her race. . . . If the party making the Batson challenge establishes a *prima facie* case, the trial court must require the non-moving party to proffer a race neutral explanation for striking the potential juror. . . . This second step does not require the party to give an explanation that is persuasive or even plausible. . . . Finally, if the non-moving party proffers a race neutral explanation, the trial court must determine whether the moving party has carried his or her burden of proving that the strike was motivated by purposeful discrimination.

*Galarza*, 252 F.3d at 636 (internal citations and quotation marks omitted). Where the non-moving party is shown to have a "mixed motivation" based on both race-neutral and discriminatory reasons, the burden shifts to the non-moving party to show that it would have exercised the peremptory strike regardless of the illegitimate motive. *Howard*, 986 F.2d at 30; *U.S. v. Douglas*, 525 F.3d 225, 239 (2d Cir. 2008) ("Where a prosecutor has articulated multiple reasons for his peremptory challenge, one of which is race, 'dual motivation' analysis is appropriate.").

In this case, during jury selection the prosecution struck juror Lugo, an Hispanic woman, after the following conversation took place:

> MR. HARFORD [prosecutor]: Mrs. Lugo, when a pipe in your house busts and water spills out all over the place who do you call?
>
> A JUROR: Plumber.
>
> MR. HARFORD: Right. Do you ever call the electrician?
>
> A JUROR: No.
>
> MR. HARFORD: He doesn't –
>
> A JUROR: Not unless I know that he does plumbing.
>
> MR. HARFORD: Nicely done because you are looking for someone who has the knowledge needed to help with your problem, right. . . .

Tr. 151. Petitioner challenged the strike, pursuant to *Batson*. Responding to petitioner's *Batson* challenge, the prosecutor proffered the following reasons for striking Mrs. Lugo:

> MR. HARFORD: [First,] one of the things that I noticed about Mrs. Lugo is when she took her seat as a prospective juror the first thing she did was she stared at the defendant for what seemed like an incredibly long minute staring, looking at him and it seemed to me that almost immediately she seemed to connect with him. And I had to be worried about whatever sympathy that she

might have for him because it was him and only him that she seemed to be looking at. The first thing she did when she took the seat. [Second,] something else I noticed is when one point in time when I got up to talk to her and the whole rest of the panel [*sic*] I guess I can describe it. She was sitting in her chair with her legs crossed turned away. Her hands folded at her face and up to her chin and wouldn't look at me. Indeed as I went through there came a point in time when I specifically directed questions to her and I will say that at that point in time she turned towards me. . . . [Third,] if the court will recall what I was discussing with Mrs. Lugo was this concept of what happens when your pipes bust. You call the plumber or electrician. She said I call the plumber. I said what if you like the electrician a lot more and he charged a lot less. Obviously I was trying to make the point, Judge, that regardless of how much you might like the electrician or how much less he might charge you still have to go to the guy with the specialized knowledge. She on this very basic concept chose to sort of argue with me. Said, well, maybe I will call the electrician and see if he knows anything about plumbing. She was somewhat argumentative with me and I have to be concerned about that . . . My point is this, Judge, rather than accept what I was presenting as a very, very basic concept she chose instead I would submit to split hairs with me. . . . Now it is clear, Judge, I don't have an ocean of evidence in this case and it is equally clear that I need 12 people that are going to be able to agree. I need people that can agree. Not people that like to split hairs and like to argue and that was the impression I got from her at that point in time that she is someone who likes to split hairs and argue and I have to be very concerned about that when the jury is considering this case. I was presenting a very basic common sense concept and yet still I had this back and forth with her which troubled me and I was wavering on her.

Tr. 226-28. The trial court credited the prosecution's reason regarding juror Lugo's argumentative propensities but declined to credit the other reasons regarding juror Lugo's body language:

> THE COURT: I viewed the entire panel. I did not see anything inappropriate in Mrs. Lugo's body movements that would in any way be visual to the court. So I am not going to consider those as bonafide. However, because it is something that was not discernible to this court, however, there was a second part to the DA's argument and this is something that was predicated upon specific questions and answers which are part of the record and which are subject to much scrutiny by the court and whether or not the court agrees with presentation of a plumber verses electrician analogy is not . . . appropriate. Just as the court doesn't review whether a pea soup analogy which the defense likes to employ is really suited for the purpose. Both attorneys have the right to couch their questions to the jury in analogies that make sense to them. Such an argument has

been posed by the District Attorney in that he is dissecting her answer and saying that is that answer that causes him concern about her ability to be fair and impartial. Specifically, there was a question posed to the panel that would lead one to assume an answer was going to be yes, you call the plumber if the pipe burst. Even though you might like the electrician better and district attorney but [*sic*] on the record that one reason for striking Mrs. Lugo was that she was unwilling to give that answer and instead gave an answer that I do recall. In fact I think there was a laugh, a great deal of laughter when the answer was given not only from the panel in the box but from the entire panel of prospective jurors in the courtroom that everyone thought it was very novel or funny. The DA rather than viewing it as novel or funny says that in fact in his view what she was doing was saying well, she would still call that electrician and maybe see what he knew about plumbing was that he was analyzing it in terms of purposefully splitting hairs with the District Attorney trying to make a point and he also called it argumentative. Although when it first happened everyone just seemed to view it as amusing that doesn't prevent the court from analyzing the District Attorney's response to see whether or not employing his peremptory challenge of her in a non-discriminatory fashion or whether it is purposefully discriminatory. . . [T]he court is going to find that the reasons founded in the record as to the repartee between Mrs. Lugo and the People on the electrician plumber is sufficient for the court to find that the peremptory challenge, the answer given was one that was not [sic]-- non-discriminatory explanation for challenging that juror [Mrs. Lugo] and not pretextual. . . .

Tr. 230-33. The trial court further explained, in response to defense counsel's objections, that "the record is quite clear that the court discounted *all* body language explanations from *both* sides since I did not view them" and that "I did not accept the visual observations by *either one of you*." Tr. 234 (emphases added). Instead, the court "founded its decision entirely on the very specific arguments about question and answer and its relationship to the People's belief of the strengths of their case." *Id.*

Petitioner's first argument, that it became the prosecution's ultimate burden to prove that it would have struck Mrs. Lugo in any event for legitimate reasons, is based on the incorrect assumption that there was a finding of a "mixed motivation." The burden shifting that happens under *Howard* occurs only after the moving party meets his ultimate burden of showing

discriminatory motivation. *U.S. v. Taylor*, 92 F.3d 1313, 1328 (2d Cir. 1996). In *Howard*, for example, the prosecutor conceded that "race had been a factor in his peremptory challenge decisions, but suggested other factors that he claimed had been more significant." *Howard*, 986 F.2d at 25. Because "*the prosecutor's partially improper motivation had been established*, [petitioner] was entitled to prevail unless, under dual motivation analysis, the prosecutor could sustain *his* burden of showing that he would have exercised his challenges solely for race-neutral reasons." *Id.* at 30 (emphases altered). By contrast, the *Howard* dual motivation analysis was never implicated in this case because there was no finding that the prosecutor's decision to strike Juror Lugo was motivated, even partially, by race. Although it is true that at step three the trial court in this case declined to credit the prosecution's reasons regarding Mrs. Lugo's body language, this does not equate to a finding of purposeful discrimination. At step three a trial court's rejection of the non-moving party's proffered reasons permits, but does not compel, a finding of purposeful discrimination. *See Hernandez v. N.Y.*, 500 U.S. 352, 365 (1991) ("At [the third] stage, implausible or fantastic justifications *may* . . . be found to be pretexts for purposeful discrimination.") (emphasis added); *Cf. St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993) (holding that, in an employment discrimination suit, a trial court's rejection of the defendant's proffered race-neutral reasons permits, but does not compel, a finding that there was discriminatory intent). Here, the defendant did not establish, and the trial court did not find, that the prosecution's body language explanation was a pretext for purposeful discrimination or that race was a factor in the prosecution's decision to strike Juror Lugo. Instead, the trial court explicitly declined to accept *either* party's body language explanations simply because the court

had not viewed them and found that the State exercised its peremptory strike against Juror Lugo because of her argumentative tendencies and that this reason was not a pretext for discrimination.

Petitioner's second argument, that this court set aside the statutory presumption of correctness afforded the trial court's finding regarding discriminatory intent, also fails because it does not overcome the high standard of deference that a habeas court must afford a trial court's factual finding. A trial court's step three determination regarding discriminatory intent is a factual finding that is afforded great deference. *Hernandez*, 500 U.S. at 364-65. To issue the writ, a habeas court "must more than simply disagree with the state fact finding . . . .If the record is ambiguous such that two different views of the facts find fair support in the record, section [2254(e)(1)] mandates deference to the state court's fact finding." *Washington v. Schriver*, 255 F.3d 45, 55 (2d Cir. 2001) (internal citations and quotation marks omitted).

Petitioner's characterization of the prosecutor's reasons and the judge's statements are incorrect. In particular, petitioner's claim that the trial court mistakenly recalled Mrs. Lugo giving an answer different from the one in the record, Reply Br. of Petitioner at 2, is without merit. The trial court never recalled, as petitioner claims, that Mrs. Lugo said she would call an electrician and not a plumber if she liked the electrician better. Rather, the court recalled, as did the prosecutor, that Mrs. Lugo was unwilling to give the *simple* answer desired by the prosecutor. *See* Tr. 231.

In sum, petitioner has failed to establish that the prosecutor was motivated by purposeful discrimination in striking Mrs. Lugo.

## III. Ineffective Assistance of Appellate Counsel

Petitioner argues he was denied the effective assistance of appellate counsel because

appellate counsel did not raise the issue of prosecutorial misconduct on appeal. Petitioner claims that the prosecutorial misconduct issue was preserved for appeal, was much stronger than the issue that appellate counsel did raise, and that appellate counsel's decision not to raise it cannot be deemed strategic.

Specifically, petitioner argues that appellate counsel was ineffective because he failed to argue on appeal that the prosecutor had engaged in misconduct during summations. For example, during the defense's summation, defense counsel argued that the prosecution had failed in its proof. He told the jury that "Now, we heard nothing about the investigation into Mr. Lopez's death. You heard that there was a detective assigned to investigate the case but we never heard from him." Tr. 1168. The district attorney objected and, in the presence of the jury, said "He [defense counsel] spoke to that detective." *Id.* At side bar, defense counsel argued that the prosecutor's comment was "totally improper" because it was "not part of the evidence." He argued that it was an attempt by the prosecutor to "introduce something to the jury to make them think something other than what the evidence or lack of evidence shows in this case." Tr. 1169. The court overruled the prosecution's objection, denied the defense's mistrial motion, but found the district attorney's comment inappropriate and gave a limiting instruction to that effect. Tr. 1172-73, 1176.

Petitioner further argued that the prosecutor engaged in misconduct during the State's summation because the prosecutor (1) argued that Lopez's prior conviction demonstrated a propensity to commit drug crimes, Tr. 1226; (2) asked the jury to infer what the police would have done if they found out that Ferra was lying, *Id.*; (3) asked the jury to speculate that Ferra knew what would happen to him if he lied, *Id.*; (4) asked the jury to speculate that petitioner

knew that Ferra was wanted by the police, Tr. 1230; (5) belittled the defense by suggesting that his view of the evidence was different from defense counsel's, Tr. 1229; (6) vouched for his witness and argued an inference unsupported by the record when he told the jury that "a lie would get [Ferra] in deeper," Tr. 1231; (7) told the jury that Ferra was not permitted to read his prior statements, Tr. 1229; and (8) improperly assailed the petitioner's character by referring to him as a rat. Tr. 1231. The trial court denied the motion, finding that the prosecution's comments properly dealt with Ferra's credibility. Tr. 1232-34.

To be granted habeas relief for the ineffective assistance of appellate counsel petitioner must show both that his attorney's performance "fell below an objective standard of reasonableness" and that there is a "reasonable probability that but for counsel's error, the outcome would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984); *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994). If petitioner fails to satisfy either prong of *Strickland*, petitioner is not entitled to habeas relief based on ineffective assistance of counsel. *See Henry v. Poole*, 409 F.3d 48, 63 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 691 (an "error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment"). Petitioner must also satisfy the requirements of AEDPA by showing that the state court's rejection of his claim was either contrary to or an unreasonable application of applicable Supreme Court precedent. *Henry*, 409 F.3d at 67.

A. The Performance Prong

The performance prong of *Strickland* requires petitioner to overcome a "strong presumption that counsel's conduct falls within the wide range of reasonable professional

15

assistance." *Strickland*, 466 U.S. at 689. An appellate attorney does not have a duty to raise every colorable claim on appeal, *Jones v. Barnes*, 463 U.S. 745, 751-53 (1983), and "[a] petitioner may establish constitutionally inadequate performance only if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." *Bien v. Smith*, 546 F. Supp. 2d 26, 54 (E.D.N.Y. 2008). Petitioner fails to show that the Appellate Division's denial of his coram nobis petition was an unreasonable application[2] of federal law. While petitioner's claim of prosecutorial misconduct was not frivolous, it is not clearly and significantly stronger than the claim that appellate counsel did raise regarding admission into evidence of Lopez's prior conviction.

     B.  <u>The Prejudice Prong</u>

Petitioner also fails to satisfy the prejudice prong of *Strickland*. To prove prejudice petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Petitioner cannot show that appellate counsel's failure to raise the prosecutorial misconduct claim on direct appeal resulted in prejudice on direct appeal. The underlying prosecutorial misconduct claim likely would not have led to a reversal, and therefore, petitioner has failed to show a reasonable probability that, had appellate counsel raised the issue on direct appeal, the result of his appeal would have been different.

_____

[2] Because the Appellate Division cited *Jones* in its summary disposition denying Perez's coram nobis petition, this Court's review of that decision is governed by the "unreasonable application" prong of § 2254(d)(1). *See Clark v. Stinson*, 214 F.3d 315, 322 (2d Cir. 2000) (applying the "unreasonable application" prong where the Appellate Division cited *Jones* in a summary disposition of a coram nobis petition).

Prosecutors are allowed to comment fairly on the evidence, *United States v. Young*, 470 U.S. 1, 10 (1985) (*quoting* ABA Standard for Criminal Justice 4-7.8 ("In closing argument to the jury the lawyer may argue all reasonable inferences from the evidence in the record")); *People v. Ashwal*, 39 N.Y.2d 105, 109 (1976), and to respond to the comments and summation of the defendant. *People v. Romano*, 50 A.D.3d 1162 (2d Dept. 2008) (citing *People v. Galloway*, 52 N.Y.2d 396 (1981)); *see Young*, 470 U.S. at 11-12. Moreover, if a prosecutor were to make improper remarks, a court can cure any prejudice arising from those remarks by promptly and clearly advising the jury that the comments were improper and must be completely disregarded. *Ashwal*, 39 N.Y.2d at 111; *see generally Young*, 470 U.S. at 13-14. The curative instructions must effectively neutralize the prejudicial remarks. *People v. Rosa*, 14 A.D.2d 741 (1961).

Petitioner argues that the prosecutor's comments during the defense summation—that defense counsel had spoken to a detective who did not testify—made the prosecutor an unsworn witness and shifted the burden of proof to the defendant. Further, petitioner claims the trial court added its imprimatur to the prosecutor's improper comments because it did not give curative instructions. This argument is meritless because the trial court did give a curative instruction when it instructed the jurors to strike the prosecutor's comment from their minds. Tr. 1176. After the curative instruction the prosecutor did not make any more improper comments regarding the detective who did not testify.

Petitioner is similarly wrong regarding his claim that the trial court did not sustain his objection on the prosecutor's comment speculating as to what people in Ferra's neighborhood knew. The trial court sustained petitioner's objection "as to what people around the corner knew." Tr. 1203. Given the presumption that juries follow curative instructions, *Rustici v.*

*Philips,* 497 F. Supp. 2d 452, 478 (E.D.N.Y. 2007), petitioner fails to demonstrate why these instructions did not effectively neutralize any prejudice.

Petitioner claims that the prosecutor's summation comment that some inconsistencies in Ferra's testimony could be explained because "he wasn't allowed to read any of his testimony" was improper because there were no facts in the record to support that comment. Pet. Mem. at 35; Tr. 1219. However, during cross-examination petitioner's counsel asked Ferra whether he had been shown his prior testimony, and Ferra replied "No." Tr. 865. Thus, the prosecutor's statement was fair comment on the evidence.

Petitioner next argues that the prosecutor vouched for his witness when he argued that Ferra had solved the Lopez murder. Pet. Mem. at 35-36. Again, petitioner is mistaken as to how the trial court ruled on petitioner's objection. Petitioner claims that the court sustained his objection to the prosecution's statement that Ferra solved the murder. *Id.* at 35. While the trial court did sustain an objection, it was regarding the prosecution's speculation about petitioner's motives for the murder, not the claim that Ferra solved the murder. Tr. 1196-97. The prosecutor's claim that Ferra solved the murder was fair comment on the evidence because Ferra was the State's main witness in the case.

Petitioner also attempts to show that the prosecutor vouched for Ferra by linking the prosecutor's comments regarding Ferra's motivation for telling the truth to the prosecutor's comment that Ferra "was bound by the truth." Tr. 1209, 1210, 1213, 1222. This argument fails because the trial court properly overruled petitioner's objections regarding Ferra's motivation for testifying. The prosecutor's argument regarding the actions police might have taken had they found that Ferra lied was an inference the prosecutor asked the jury to draw based on the trial

18

evidence and their own common sense. The jury could reasonably conclude that the Ferra would face some consequences had the police been unable to corroborate Ferra's statements.

Moreover, the prosecutor's comments about Ferra's motivation for testifying was a fair response to petitioner's summation and the cross-examination of Ferra. The defense challenged Ferra's credibility and motive for testifying. During cross-examination, defense counsel repeatedly asked Ferra whether, as a result of the cooperating with the District Attorney, the charges against him were reduced. Tr. 928-31. In response to such questioning, which suggested that Ferra lied in order to benefit from the cooperation agreement, the prosecutor properly argued that it was not in Ferra's interest to lie.

Finally, petitioner argues that the prosecutor undermined the trial court's instructions that the jury could not consider Lopez's 1976 drug conviction as evidence of propensity to engage in the drug trade in 1995 when he asked the jury "is it any coincidence that the man killed happens to have a prior criminal [sic] for criminal sale in the first degree?" Even though the trial court sustained petitioner's objection to this comment and gave additional curative instructions, petitioner claims the damage had been done because the jurors inferred Lopez was likely to be dealing drugs in 1995 because he dealt drugs in 1976. Pet. Mem. at 36-37. Petitioner is wrong. The jury is presumed to follow a court's curative instructions. *Rustici,* 497 F. Supp. at 478; *see also Pretlow v. Lord*, 2005 WL 1073609, at *4 (E.D.N.Y. April 29, 2005) ("[E]rrors were resolved at trial when the court sustained [d]efendant's objections . . . instructed the jury . . . and admonished the prosecutor"). Except for a conclusory statement that "the damage was done," Pet. Mem. at 36, petitioner offers no reason or case law why the prosecutor's comment was so

insidious as to overcome the presumption that the jury followed the court's curative instructions.[3]

## IV.  Admission of Lopez's Prior Drug Conviction

Petitioner argues he was deprived of a fundamentally fair trial because Lopez's prior drug conviction was improperly admitted into evidence.  Specifically, petitioner argues that: (1) the evidence's sole purpose was to establish Lopez's propensity to sell drugs, and (2) the evidence lacked probative value because it was too remote. *Id.* at 42-43.

A federal court conducting habeas review is limited to determining whether a petitioner's custody is in violation of federal law. *Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir. 1998). Because "federal habeas relief does not lie for violations of state law," *Estelle v. McGuire*, 502 U.S. 62, 67 (1991), the "erroneous application of state evidentiary rules alone does not merit habeas relief." *Sims v. Stinton*, 101 F. Supp. 2d 187, 194 (S.D.N.Y. 2000). Particularly, "the mere admission of prior bad acts by the trial court, even if offered for propensity purposes, is not, without more, sufficient to establish a constitutional violation that demands issuance of the writ." *Schicchi v. Ercole*, 2007 WL 837109, at *7 (E.D.N.Y. March 18, 2007).

Federal habeas relief is available for state court evidentiary errors that violate petitioner's due process rights under the Constitution.  However, "[t]he introduction of improper evidence against a defendant does not amount to a violation of due process unless the evidence is so

_____

[3]  Lastly, although not emphasized as an argument in support of his habeas petition, petitioner argued at trial that the prosecutor improperly assailed the petitioner's character by referring to him as a rat. Tr. 1231.  The trial court rejected petitioner's argument, finding that the prosecutor's analogy implied that Victor Ferra was a rat, not that petitioner was a rat. Tr. 1234. Upon review of the transcript, I conclude that the state trial court's factual findings were not clearly erroneous:  the transcript establishes that the prosecutor argued that the jury should believe the testimony of cooperating witness Victor Ferra, even though he was a convicted criminal, because "if . . . you want to know what's going on in the sewer you have to talk to the rats." Tr. 1222.

extremely unfair that its admission violates fundamental conceptions of justice." *Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir. 1998) (quoting *Dowling v. United States,* 493 U.S. 342, 352 (1990)). For the writ to issue, two conditions must be satisfied. First, the improperly admitted evidence's prejudicial impact must outweigh its probative value. *Bronshtein v. Horn*, 404 F.3d 700, 730 (3d Cir. 2005) ("Admission of other crimes evidence provides a ground for federal habeas relief only if the evidence's probative value is so conspicuously outweighed by its inflammatory content, so as to violate a defendant's constitutional right to a fair trial."); *cf. Dunnigan*, 137 F.3d at 125 ("Where the prejudicial evidence is probative of [an] essential element in the case, its admission does not violate the defendant's right to due process.") (internal quotations omitted). Second,

> the erroneously admitted evidence, viewed objectively in light of the entire record before the jury [must be] sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed in the record without it. In short it must be crucial, critical, highly significant.

*Collins v. Scully*, 755 F.2d 16, 19 (2d Cir. 1985); *Dunnigan*, 137 F.3d at 125.

Even assuming that evidence of Lopez's prior conviction was, as a matter of state law, improperly admitted, it does not render petitioner's trial fundamentally unfair. The prior conviction's probative value was *not* substantially outweighed by the risk of unfair prejudice. Because Ferra's testimony was central to establishing that petitioner committed the murder and the motive for the murder, evidence that enables the jury to evaluate Ferra's credibility is "probative of [an] essential element in the case." That Lopez's prior drug conviction was nineteen years-old at the time of the murder is "not a dispositive factor" making the evidence too remote to be probative for the purposes of habeas review. *See Butti v. Unger*, 2005 WL 1676739, at *4 (S.D.N.Y. July 15, 2005) (finding the fairness of the trial, rather than the time

lapse between a past conviction and charged crime, is the dispositive factor for habeas review).

Petitioner argues that the probative value of the evidence arises only from a propensity inference, namely, that if Lopez was convicted of drug dealing 19 years earlier, it is more likely that he committed the drug dealing to which, Ferra testified, petitioner confessed. The record does not reveal whether the drug dealing was, as petitioner's brief suggests, in 1995 or was part of the crime for which Lopez was convicted 19 years earlier. Ferra simply testified that the man petitioner said he had murdered had been pestering him for money he owed him on a drug transaction. But even assuming that the probative value of the evidence to Ferra's credibility—the only ground for which it was admitted by the trial court[4]—depended upon a preliminary inference based on propensity, no constitutional violation has been shown. The probative value of the evidence was not outweighed by its prejudice. It was not inflammatory and did not even relate to petitioner's past acts.

Petitioner's claim also fails to satisfy the second condition necessary for habeas relief. Any effect the evidence had on the trial does not approach the level of materiality recognized by the Second Circuit as being "crucial, critical, highly significant." The admitted evidence was not "sufficiently material to provide the basis for conviction or to remove a reasonable doubt that

---

[4] The trial court gave the following limiting instruction:

[e]vidence of a drug conviction of the deceased, Franklin Lopez, in 1976, in a specific instance is permitted to be placed before you to provide background information to you as to the deceased Franklin Lopez. It may not be considered by you in any way as evidence of a propensity by Mr. Franklin Lopez to sell drugs or that he in any way engaged in the sale of drugs in 1995. Such evidence is admitted solely to assist you in determining the credibility of other evidence admitted. You the jury are the sole judges of the weight, if any, to be given this evidence. In addition, this information concerning the deceased's past criminal history had no relationship to the defendant's activity in this case. Tr. 1091-92.

would have existed in the record without it." *See Dunnigan*, 137 F.3d at 125 (citing *Mckinney v. Rees*, 993 F.2d 1378, 1384, 1386 & n. 10 (9th Cir. 1993), *cert. denied*, 510 U.S. 1020 (1993) (due process violation found where evidence of defendant's other acts occupied "over sixty pages of testimony in the record" and was twice mentioned by the prosecutor in summation as "one of [the] crucial issues in the case.")).

While the evidence was probative of Ferra's credibility, it was not the only evidence before the jury that corroborated Ferra's testimony. Ballistics indicated that the type of gun petitioner told Ferra he used to murder Lopez matched the bullet fragments recovered from Lopez's body. The lacerations on Lopez's body were consistent with the way, Ferra claims, petitioner described dragging Lopez's body to the car. Lopez's body was found in the back of a car, just as Ferra testified petitioner had said he disposed of the body. Finally, a pager number that petitioner is known to have used was found on Lopez's body, thereby corroborating that there was some relationship between petitioner and Lopez. It is clear, in light of the entire record, that the evidence at issue did not provide the basis for conviction or remove a reasonable doubt, or, at the very least, the state court was not "objectively unreasonable" in so ruling.

*Conclusion*

For the reasons outlined above, Perez's petition for a writ of habeas corpus is denied. Since petitioner has failed to make a substantial showing of the denial of a constitutional right, a certificate of appealability is denied pursuant to 28 U.S.C. § 2253(c).

**SO ORDERED.**

_____
       */s/*
**NINA GERSHON**
**United States District Judge**

**Dated:      Brooklyn, New York**
**             April 20, 2009**